**In re COREL CORPORATION INC. SECURITIES LITIGATION.**

No. 00–CV–1257.

United States District Court, E.D. Pennsylvania.

Oct. 28, 2003.

Robert P. Frutkin, Esq., Deborah R. Gross, Esq., Law Offices of Bernard M. Gross, Stuart H. Savett, Esq., Philadelphia, PA, Charles J. Piven, Esq., Law Offices of Charles J. Piven, P.A., Baltimore, MD, John Philip McCarthy, Esq., Law Offices of John Philip McCarthy, Somers Point, NJ, Paul J. Scarlato, Esq., Weinstein, Kitchenoff, Scarlato & Goldman Ltd., Philadelphia, PA, for Plaintiff.

Jennifer A. Furman, Wolf, Block, Schorr and Soliscohen, Philadelphia, PA, Judd A. Serotta, Kleinbard, Bell & Brecker LLP, Philadelphia, PA, P. Kevin Castel, Andrea Butler, Cahill, Gordon & Reindel LLP, New York City, Elizabeth B. Tedeschi, Jay A. Dubow, Wolf, Block, Schorr and Solis-Cohen LLP, Philadelphia, PA, George Wailand, Cahill, Gordon & Reindel, Tonn C. Norbitz, New York City, for Defendant.

Nicholas M. Fausto, Philadelphia, PA, for Objector.

Sherrie R. Savett, Berger & Montague, PC, Philadelphia, PA, for Movant.

## *MEMORANDUM*

ANITA B. BRODY, District Judge.

Presently before this court is plaintiffs' Motion for Final Approval of Settlement in this securities class action. Class counsel also seeks approval of their petition for attorneys' fees and reimbursement of expenses, in addition to reimbursement of lead plaintiffs' expenses. After a hearing on September 12, 2003, I grant these requests and enter a final judgment and order of dismissal.

### I. BACKGROUND

A class of investors brought this action against Corel Corporation, Inc. ("Corel") and its former Chief Executive Officer, Michael C.J. Cowpland ("Cowpland"). Plaintiffs allege that defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act as well as SEC Rule 10b–5, by issuing false and misleading statements

regarding Corel's fourth quarter 1999 and first quarter 2000 performance, and Corel's prospects for its recently-introduced Linux and other Windows products. (Pls.' Amend. Compl. ¶¶ 31, 35, 38, 50, 53, 54). According to plaintiffs, defendants made these misrepresentations in order to deceive the investing public, artificially inflate the market price of Corel's stock, and cause class members to purchase Corel stock at inflated prices. (Pls.' Amend. Compl. ¶ 6).

On March 8, 2000, plaintiffs Anthony Basilio and Fred Spagnola ("Spagnola") filed the original complaint in this class action, on behalf of themselves and all others who purchased Corel common stock between December 7, 1999 and December 21, 1999, the day before Corel released a pre-announcement of its fourth quarter 1999 loss. On May 12, 2000, class plaintiffs Spagnola, Michael Perron ("Perron"), and David L. Chavez ("Chavez") moved for consolidation of all related cases and appointment as lead plaintiffs, as required under 15 U.S.C. § 78u–4(a). 15 U.S.C. § 78u–4(a) (2003). Spagnola and Perron made their last purchases of Corel stock on or before December 21, 2000, the ending date of the class period as stated in the original complaint. Chavez, on the other hand, in addition to purchasing Corel stock on or before December 21, 2000, also made purchases of Corel stock at several points during January 2000, and made his final purchase on January 31, 2000. I granted the motion for consolidation and appointment of Spagnola, Perron, and Chavez as lead plaintiffs on July 3, 2000.

On August 14, 2000, plaintiffs filed a consolidated and amended complaint, alleging that defendants engaged in a course of conduct, as opposed to a short-lived and focused attempt, to defraud the public concerning the financial condition of Corel and to artificially inflate the company's stock prices for a period beyond December 21, 1999. This allegation altered the closing date of the class period specified in the original complaint. The amended complaint expanded the class to include "all persons who purchased Corel common stock on the NASDAQ national exchange at any time from December 7, 1999, through and including March 20, 2000." (Pls.' Amend. Compl. ¶ 13).

On January 28, 2002 I held oral argument on the class certification motion. At that time, defendants indicated that they did not contest certification of a class as defined in the original complaint, which included purchasers of stock between December 7, 1999 and December 21, 1999, but opposed the certification of any class extending beyond that date. Defendants opposed such extension on the ground that investors who purchased their stock after Corel's pre-announcement of its fourth quarter 1999 loss on December 21, 1999 differed from plaintiffs who purchased stock prior to the pre-announcement thus defeating the commonality and typicality requirements of Federal Rule of Civil Procedure 23(a). After considering the written and oral arguments of the parties and the applicable law, I issued an explanation and order certifying the class proposed by plaintiffs' amended complaint, comprised of all persons who purchased Corel common stock on the NASDAQ national exchange at any time from December 7, 1999 through and including March 20, 2000.

The parties have participated in settlement negotiations throughout the course of this litigation. First, with my consent and prior to my determination of the length of the class period, parties participated in a mediation session before Former Judge Arlin Adams on March 7, 2002. Although the March 7, 2002 mediation session was unsuccessful, after my decision certifying the class and approving plaintiffs' expan-

488

sion of the class period, the parties again met with Former Judge Adams on October 3, 2002. At the conclusion of that full day meeting, Former Judge Adams determined that a settlement on terms acceptable to the class was still not possible. Finally, near the end of fact discovery, on May 11, 2003, the parties again agreed to meet to make a final effort to reach a settlement, this time with Former Judge Nicholas Politan. After Former Judge Politan determined that the parties were close to an agreement, the parties allowed Former Judge Politan to make a settlement recommendation which either side could accept or reject. Subsequently, the parties agreed to Former Judge Politan's recommendation to settle the case for $7,000,000.

The settlement agreement provides that defendants make a cash payment of $7 million to create a gross settlement fund. In accordance with the terms of the agreement, one half of this sum was deposited into an interest bearing escrow account on July 2, 2003 and has been earning interest for the benefit of the class. The remainder of the settlement amount will be deposited into escrow when the settlement becomes final. In exchange for this amount, all claims of the class against the defendants shall be extinguished. Upon approval of the settlement and entry of an order approving distribution, the settlement proceeds (including all interest accrued), shall be distributed to class members who timely submit valid proof of claim forms to the claims administrator.[1]

On June 18, 2003, plaintiffs made an application for an order of preliminary approval of the settlement. On July 1, 2003, I entered a preliminary approval order which preceded an extensive notice program including the mailing of over 116,000 notice and claim forms to putative class members and publication of the summary notice over the Internet. In addition to informing putative class members of the proposed settlement and their rights to object or opt-out, the notice also informed class members of a fairness hearing scheduled for September 12, 2003. On August 22, 2003, plaintiffs filed the instant motion for Final Approval of Settlement and Application for Attorneys' Fees and Reimbursement of Expenses. On September 12, 2003 I held a fairness hearing. At the hearing, counsel for both plaintiffs and defendants expressed support for approval of the settlement. Although five objections to the settlement were filed with the court, none of the objectors were present at the hearing. Although all of the objections will be addressed in this opinion, of particular concern was the written objection of Mr. Stephen L. Harkavy ("Harkavy"). Harkavy, without counsel, objected to the fairness of the proposed plan of allocation in light of the fact that the class had not been divided into sub-classes with separate representation. I requested further briefing from counsel for both plaintiffs and defendants on the subject of Mr. Harkavy's written objection. Objector Harkavy was also given time to respond if he so desired, which he did. After considering the parties' positions and Harkavy's objection, I approve the settlement agreement for the reasons set forth below.

## II. DISCUSSION

### A. Final Approval of Settlement

 Federal Rule of Civil Procedure 23(e) provides that "[a] class action shall not be dismissed or compromised without

---

1. Prior to distribution to authorized claimants, the costs of notice and administration of the settlement, as well as any fees and costs to counsel and lead plaintiffs I award, will be deducted from the settlement fund.

the approval of the court." Fed.R.Civ.P. 23(e). Approval of a proposed class action settlement is within the discretion of the court. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 299 (3d Cir.1998). "In determining whether settlement should be approved, the court must decide whether it is fair, reasonable, and adequate under the circumstances and whether the interests of the class as a whole are being served if the litigation is resolved by the settlement rather than pursued." Manual for Complex Litigation, § 30.42, at 238 (3d ed.1995). The Third Circuit applies a nine prong test when determining the fairness of a proposed settlement: (1) adequacy of settlement in light of best possible recovery; (2) adequacy of settlement in light of all risks of litigation; (3) complexity, expense and likely duration of the litigation; (4) reaction of class; (5) stage of proceedings; (6) risks of establishing liability; (7) risks of establishing damages; (8) risks of maintaining class status; and (9) ability to withstand greater judgment. *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir.1975). After examining each of the nine factors, I find that the settlement agreement satisfies the Girsh test.

### 1) The Ability of the Defendants to Withstand a Greater Judgment

■ This factor is addressed first because it is the dominant factor favoring settlement in this case. Several considerations suggest that Corel could not withstand a greater judgment. First, Corel's finances have not recovered since the end of the class period. Due to significantly declining revenues and losses, Corel has sold its Linux business and has been unable to sustain operations from the sale of its products. As a result, Corel has had to depend on outside financing to sustain operations. Second, throughout this litigation, defendants have maintained that if judgment is entered against them, they will seek the protection of the Canadian bankruptcy court. If this were to occur, there would be a significant question regarding whether or not Corel's insurance policies would still be available to fund a judgment for plaintiffs. Third, on March 24, 2003, Corel announced that it signed a non-disclosure and standstill agreement with Vector Capital in anticipation of a formal offer by Vector to buy all of Corel's stock. Corel also stated its intention to recommend a bid of $1.10 per share should Vector make an offer to buy. Therefore, there is a strong possibility that Vector could acquire all of Corel's remaining cash before plaintiffs obtain judgment.

### 2) Adequacy of Settlement in Light of Best Possible Recovery

The proposed settlement agreement is fair and reasonable in light of the best possible recovery. In *General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, the Third Circuit cautioned the evaluating court to "guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, yielding of the highest hopes in exchange for certainty and resolution." 55 F.3d 768, 806 (3d Cir.1995). Even if the proposed settlement amounts to only "a fraction of the potential recovery," it does not necessarily follow that the settlement "is grossly inadequate and should be disapproved." *In re Sunrise Sec. Litig.*, 131 F.R.D. 450, 457 n. 13 (E.D.Pa.1990). There is a range of reasonableness applicable to any given case; the appropriate amount is not susceptible to a mathematical formula yielding a particular sum. In this case, the "best possible recovery" is highly disputed between the parties. Plaintiffs' damages expert estimates that the total damages sustained by the class is

$46.3 million. Therefore, the proposed settlement of $7,000,000 plus interest amounts to, at worst, 15% of the maximum provable damages. A settlement amounting to 15% of maximum provable damages is within the range of settlement agreements approved by other courts in this District. *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 144 (E.D.Pa.2000); *In re Crazy Eddie Sec. Litig.*, 824 F.Supp. 320, 324 (E.D.N.Y.1993).

### 3) Adequacy of Settlement in Light of all Risks of Litigation

In assessing the fairness, reasonableness and adequacy of a proposed settlement, a court must balance the immediacy and certainty of a substantial recovery against the risks of continuing litigation. *Girsh*, 521 F.2d at 157. In this case, defendants vigorously deny that they engaged in any wrongdoing. In addition, the presence of serious factual and legal obstacles place plaintiffs at a considerable risk in establishing both liability and damages. Assuming plaintiffs could prevail at trial, lengthy appeals would likely prolong this case for years. Finally, plaintiffs face the significant possibility that a judgment would not be collectable, or would be limited to the available insurance coverage.

### 4) Complexity, Expense, and Likely Duration of Litigation

This action has been, and, absent settlement, would continue to be extremely complicated, expensive, and lengthy. Plaintiffs recognize that, because of the nature of available information, proving their case at trial would depend upon the development of a complicated paper trail through numerous public and private documents, and would require the jury to comprehend complex financial documents. In addition, plaintiffs have informed the court that because they would have to rely on Corel internal documents created after the alleged fraud, rather than contemporaneously, plaintiffs would be required to prove their claims largely by the inference that because certain types of data were monitored by managers after the alleged fraud, those managers knew or should have known that Corel would post a loss by the beginning of the class period. In addition, plaintiffs would have to show that information regarding the loss was communicated to defendant Cowpland. Thus, the complexity of proof in this case makes the outcome of trial, and potential appeals, uncertain.

### 5) Reaction of class

Over 116,000 copies of the notice were sent to class members and a summary notice was published on the internet on July 15, 2003. As of August 29, 2003, the last date for filing objections to the settlement, only five class members objected. Of those five objectors, only two, Loretta Adelstein ("Adelstein") and Robert F. Aberger ("Aberger"), objected to the settlement itself. Also, as of the date of plaintiffs' Motion for Final Approval of Settlement, August 22, 2003, there had been only twenty requests for exclusion from the class.[2]

Although courts routinely infer support for a settlement from the absence of a large number of objectors, courts "must be cautious about 'inferring support from a small number of objectors to a sophisticated settlement.'" *Ikon Office Solutions, Inc. Securities Litigation*, 194 F.R.D. 166, 179 (E.D.Pa.2000) (quoting *In re Gen. Motors Corp.*, 55 F.3d at 812). This admoni-

---

**2.** The total shares purchased by persons validly requesting exclusion was only 10,047 shares.

tion is especially relevant in securities cases, where the small holdings of many stockholders render the marginal benefit of opposition small. *Ikon*, 194 F.R.D. at 179. Bearing this in mind, the small number of objectors remains some measure of the strength of the opposition.

■■■ Adelstein and Aberger object to the settlement on two grounds. First, they argue that the notice sent to the class did not provide potential class members with enough information to adequately assess the prospects of litigation. This objection implicates the ability of class members to evaluate, and, if necessary, to object to the settlement. A decision that notice is appropriate is required before any inquiry is made into the merits of the settlement itself. E.g., *In re Prudential*, 148 F.3d at 326–37. The due process requirements of Federal Rule of Civil Procedure 23 demand that, prior to final approval of a class action settlement, class members be given the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable efforts. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). In an order filed July 2, 2003, I held that the form and method of notification utilized in this case met the requirements of Federal Rule of Civil Procedure 23, Section 21D(a)(7) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u–4(a)(7) as amended by the Private Securities Litigation Reform Act of 1995, and due process. Therefore, I find that the objection of Adelstein and Aberger as to the adequacy of notice is without merit.

Second, Adelstein and Aberger object that the settlement amount is not commensurate with the underlying claim. This objection is likewise without merit. For all the reasons set forth in this opinion, the settlement amount is both fair and reasonable.

Because the remaining objections relate to the requested attorneys' fees and the plan of allocation, I will address these objections in the appropriate sections of this opinion.

### 6) Stage of Proceedings

■■ Courts generally recognize that a proposed class action settlement is presumptively valid where, as in this case, the parties engaged in arm's length negotiations after meaningful discovery. E.g., *Grier v. Chase Manhattan Auto. Fin. Co.*, Civ. A. No. 99–180, 2000 WL 175126, at *5, 2000 U.S. Dist. LEXIS 1339, at *11–12 (E.D.Pa. Feb.16, 2000) (mem.). Moreover, "[t]he professional judgment of counsel involved in the litigation is entitled to significant weight." *Fisher Bros. v. Cambridge–Lee Indus., Inc.*, 630 F.Supp. 482, 488 (E.D.Pa.1985). This settlement was reached after three years of extensive discovery. Since the inception of this litigation, plaintiffs' counsel has conducted a thorough investigation regarding both the law and facts of this case. This investigation has included the review and analysis of over 120,000 pages of non-public documents produced by defendants, the depositions of current and former employees, officers, and directors of Corel, as well as consultations with experts regarding accounting, financial statement presentation, and damages. In addition, participation in mediation sessions first with Former Judge Adams and, most recently, with Former Judge Politan provided counsel with valuable insights into the merits of their respective positions. In fact, the Settlement amount was recommended to the parties by Former Judge Politan. Taking into account all of these factors, this settlement was reached at a stage when the litigation was significantly advanced so

that all parties were fully informed of the strengths and weaknesses of their positions.

### 7) Risks of Establishing Liability

Settlement provides a certain and immediate recovery for plaintiffs who face significant risks in further litigation. *See Girsh,* 521 F.2d at 157. In addition to the substantial risks plaintiffs faced in collecting a potential judgment, plaintiffs faced significant risks in establishing both liability and damages at trial.

As previously stated, this case involved, *inter alia,* federal securities claims under Section 10(b) of the Securities and Exchange Act of 1934 and SEC Rule 10b-5. 15 U.S.C. § 78j(b) (2003); 17 C.F.R. § 240.10b-5 (2003). Defendants have consistently denied liability. While plaintiffs' counsel believe that there is a strong liability case against defendants, to succeed under SEC Rule 10b-5, plaintiffs would have the substantial burden of demonstrating that defendants were responsible for material misstatements or omissions of fact in connection with public statements about Corel's financial status; that the class justifiably relied upon this misconduct; and that the class suffered damages as result. *Hayes v. Gross,* 982 F.2d 104, 106 (3d Cir.1992); *Krangel v. Golden Rule Resources, Ltd.,* 194 F.R.D. 501, 508 (E.D.Pa. 2000). Plaintiffs would also have to prove that defendants acted with the requisite scienter-either actual knowledge of their misrepresentations or a reckless disregard for the truth. *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 539 (3d Cir.1999). This burden is exacerbated by the fact that plaintiffs would have had to establish their case almost exclusively through documents and the testimony of hostile witnesses. While plaintiffs' counsel believe that they have significant support for the allegations of the class, avoiding the risks of establishing liability is another factor which militates in favor of approving the proposed settlement.

### 8) Risks of Establishing Damages

Even if plaintiffs could establish liability, they faced substantial difficulty establishing damages. Although plaintiffs would most likely have used the decline in Corel's common stock as the basis for their damage claims, defendants have argued that this decline merely reflected a general industry trend in Linux based technology companies. To succeed at trial, plaintiffs would have had to distinguish between the impact of the fraud on the price of Corel stock and the impact of such other, non-actionable forces. The conflicting damage theories of defendants and plaintiffs would likely have resulted in an expensive battle of the experts and it is impossible to predict how a jury would have responded.

### 9) Risks of Maintaining Class Status

■ The value of a class action in terms of the range of recovery one can expect depends largely on the certification of the class and the ability to sustain that class through trial. *In re General Motors,* 55 F.3d at 817. Although I already certified a class in this case, class certification is subject to review and modification at any time during the litigation. *Zenith Lab., Inc. v. Carter–Wallace, Inc.,* 530 F.2d 508, 512 (3d Cir.1976). In fact, defendants would almost certainly have challenged the length of the class period certified again at trial. Since the risk of decertification is present, but not high, this factor neither supports nor undermines approval of this settlement.

In summary, all of the *Girsh* factors weigh in favor of approval except the last factor, risks of maintaining class status, which weighs neither in favor of nor

against approval of the settlement. Most importantly, the current state of Corel's economic viability and the unlikelihood that Corel could withstand a greater judgment even if plaintiffs could prevail at trial, in addition to consideration of the other factors, supports my finding that this settlement is in the best interests of the class.

## B. The Plan of Allocation

■■ The plan of allocation of settlement proceeds among class members must also be approved as part of the settlement. Fed.R.Civ.P. 23. The same standards that apply to approval of the settlement as a whole also apply to the plan of allocation: the plan of allocation must be fair, reasonable and adequate. *In re Cendant Corp. Litigation*, 264 F.3d 201, 248 (3d Cir.2001).

■ Plaintiffs' counsel proposed the plan of allocation after consultation with plaintiffs' damages expert as well as analysis of the merits of the claims. The plan of allocation provides that each authorized claimant receive, on a pro rata basis, that share of the net settlement fund that the claimant's recognized claim bears to the total recognized claims of all authorized claimants in accordance with the formula set forth below:

a) For each share of Corel common stock purchased on the NASDAQ national market during the period December 7, 1999 through and including December 22, 1999 ("Period 1") and sold between December 23, 1999 and March 20, 2000 inclusive ("Period 2"), the Recognized Claim shall be $2.29 per share;

b) For each share of Corel common stock purchased on the NASDAQ national market during Period 2 and held through the close of trading on March 20, 2000, the recognized claim shall be $0.44 per share;

c) For each share of Corel common stock purchased on the NASDAQ national market during Period 1 and held through the close of trading on March 20, 2000, the recognized claim shall be $2.73 per share, which is the $2.29 recognized claim for Period 1 plus the $.44 per share recognized claim in Period 2;

d) For each share of Corel common stock purchased and sold within Period 1, the recognized claim shall be zero because the estimated inflation per share at the time of purchase was equal to the estimated inflation at the time of sale; and

e) For each share of Corel common stock purchased and sold within Period 2, the recognized claim shall be zero because the estimated inflation per share at the time of purchase was equal to the estimated inflation at the time of sale.

■ Courts in this district "generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable." *Aetna Inc. Sec. Litig.*, Civ. A. MDL 1219, 2001 WL 20928, at *12, 2001 U.S. Dist. LEXIS 68, at *36 (E.D.Pa. Jan.4, 2001) (mem.) *citing In re Ikon*, 194 F.R.D. at 194. It is appropriate, however, to closely analyze the plan of allocation in this settlement given the disparate treatment of claimants who fall into Period 1 as compared to claimants who fall into Period 2, and the absence of sub-classing. Although the distinction between Period 1 and Period 2 claimants has been clear since the class was certified, the plan of allocation was not developed until after the $7,000,000 settlement was reached. In addition, class member Mr. Harkavy, a Period 2 claimant, specifically objected to the plan of allocation.

As previously stated, at the fairness hearing, I ordered the plaintiffs and defen-

dants to further brief the fairness of the proposed plan of allocation. I also granted objector Harkavy time to respond if he so desired, which he did. After a thorough analysis of the plan of allocation and the basis for distinctions drawn, I conclude that the plan of allocation is reasonable, and the disparity in treatment accurately reflects the different risks and losses experienced by individuals who acquired and sold Corel stock at different times.

Although the plan of allocation was structured after the settlement was reached, it was based on plaintiffs' expectations regarding how they intended to present their damages case at trial. Specifically, the plan of allocation was developed as a result of the damage expert's analysis of the effect of specific events, such as Corel's pre-announcement of loss and revenue shortfall on December 22, 1999, as well as overall market factors on the price of Corel's stock at different time periods. After the damages expert arrived at a determination of estimated inflation for a given time period, that amount was then discounted by counsel's assessment of the likelihood of proving liability at trial. This methodology results in a reasonable estimate of recoverable losses for each given time period.

When applied to the facts in this case, the expert's analysis concluded that the estimated inflation was significantly higher in Period 1 as compared to Period 2. This distinction was based primarily on the fact that there were two different types of alleged misstatements in this case. The first type of statement concerned the fact that Corel expected to report a profit in the fourth quarter of 1999, when, in reality, Corel would report a loss. This statement was only made in Period 1, and was effectively nullified when, on December 22, 1999, the end of the first class period, Corel announced that it would report a loss. The second type of statement related to Corel's prospects in the emerging Linux business. These alleged misstatements were made both in Period 1 and Period 2.

In addition to the difference in estimated inflation, there was also a significant difference in the "liability factor," that is, plaintiffs' counsel's estimation of the strengths and weaknesses of the evidence of Corel's liability for the two time periods. During Period 1, primarily as result of defendants' alleged misrepresentation that Corel would report a profit for the fourth quarter of 1999, trading in Corel stock was significantly divergent from trading in stocks of its peer group of other Linux businesses. Contrary to this, during Period 2, Corel stock traded similarly to its peer group. Based on this information, plaintiffs concluded that defendants would likely assert a significant causation defense during Period 2, in effect arguing that during that period Corel's stock traded on the market's expectation that the overall Linux market would succeed as opposed to trading on Corel-specific information. Plaintiffs' determination in this regard is more than reasonable. In fact, defendants have vigorously contested their liability to class members in Period 2 since the class certification hearing. Even through settlement negotiations, defendants have consistently maintained their position that liability was much weaker and damages suffered by the class, if any, were significantly less in Period 2 than in Period 1.

I am also satisfied that plaintiffs' counsel fairly and adequately protected the interests of class members in both periods. As previously discussed, plaintiffs' counsel vigorously and successfully litigated the inclusion of Period 2 class members in the definition of the class. Had I denied plaintiffs' counsel's motion to extend the class

to include Period 2, it is unlikely that class members in Period 2 could have prevailed against Corel individually. Additionally, since one of the lead plaintiffs made purchases of Corel stock in both Period 1 and Period 2, the lead plaintiffs were not indifferent to the interests of absentee Period 2 claimants.

Finally, if, in the interest of the utmost precaution, I were to order sub-classing in this case, I believe that the result would be similar, except that additional funds from a relatively small settlement would be depleted in additional attorneys' fees. This would not be a beneficial result for the class.

### C. Attorneys' Fee Petition

██ Plaintiffs' counsel request $2,333,333 in fees in connection with their representation in this matter. When class counsel in a class action recovers a common fund for the benefit of persons other than himself or his client, class counsel should receive an award of attorneys' fees that is fair and reasonable from the fund. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). In this case, plaintiffs' counsel seek a 33⅓% share of the common fund as fees. In deciding whether to approve the fee request, I must consider both the attorneys' fee petition and the objections to the petition filed by objectors Aberger, Adelstein, and Judy Abramowitz ("Abramowitz").

██ A thorough judicial review of fee applications is required in all class action settlements. *See In re Prudential*, 148 F.3d at 333. There are two methods for calculating attorneys' fees, the percentage-of-recovery method and the lodestar method. *See id.* The Third Circuit has explained that "[t]he percentage-of-recovery method is generally favored in cases involving a common fund, and is designed to allow courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure." *Id.* (internal quotation omitted). In contrast, "[t]he lodestar method is more commonly applied in statutory fee-shifting cases, and is designed to reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation." *Id.* Since this is a common fund case, the percentage-of-recovery method provides a more appropriate basis for evaluating plaintiffs' counsel's fee petition. However, the Third Circuit has stated that "it is sensible for a court to use a second method of fee approval as a cross check." *Id.* (internal quotation omitted).

### 1. Reasonableness of the Fee Requested

██ The Third Circuit has identified seven factors that should be considered in deciding whether a fee petition should be approved. *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 (3d Cir.2000). These are: 1) the size of the fund created and the number of persons benefitted; 2) the presence or absence of substantial objections by members of the class to the settlement terms or fee request; 3) the skill and efficiency of the attorneys involved; 4) the complexity and duration of the litigation; 5) the risk of nonpayment; 6) the amount of time devoted to the case by counsel; and 7) the awards in similar cases. These factors all weigh in favor of approving the attorneys' fee petition in this case.

### (a) The Complexity and Duration of

496

**the Litigation** [3]

■ As discussed above, this was a complex action involving alleged violations of the federal securities laws in which the plaintiffs bore the burden of proof. This action has been zealously litigated for over three years, during which time plaintiffs' counsel briefed and argued numerous motions, including, *inter alia,* dismissal under *forum non conveniens* principles and pursuant to Rules 9(b) and 12(b) of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 9(b), 12(b). Also, despite defendant's opposition to the length of the class period, plaintiffs successfully obtained an order certifying the class for the extended period and fought an appeal of my ruling to the Third Circuit. Additionally, plaintiffs' counsel conducted intensive discovery including voluminous document review, numerous depositions, and consultation with experts.

**(b) The Presence or Absence of Substantial Objections by Members of the Class to the Settlement Terms and/or Fees Requested by Counsel**

The reaction of the class in this case also supports approval of the fee petition. The notice informed class members that the attorneys would request an award of up to 33⅓% of the settlement fund as fees. The notice also informed class members of their right to object to this application. Despite the large number of class members notified, only three objections relating to the fee petition were received, namely the objections of Aberger, Adelstein, and Abramowitz. Again, as stated in my discussion of the reaction of the class to the settlement itself, although a small number of objectors is some measure of the strength of opposition to the petition, I am

cautious to infer too much from this fact. *See supra* Part II.A.5.

**(c) The Skill and Efficiency of the Attorneys Involved**

Plaintiffs' counsel primarily practice in the highly complex field of shareholder securities litigation and have brought their considerable experience to bear in reaching this settlement. Also, the fact that plaintiffs' counsel obtained this settlement in the face of formidable legal opposition further evidences the quality of their work.

**(d) The Size of the Fund Created and the Number of Persons Benefitted**

The settlement is for $7,000,000 plus certain interest. Although this is a relatively small amount given the potential number of authorized claimants, for the reasons discussed above in Part II, the settlement is fair, adequate, and reasonable given the circumstances of this case. The claims administrator has disseminated over 116,000 notices to prospective class members and a summary notice was published on the internet on July 15, 2003. Since the claims filing deadline is December 1, 2003, it is impossible to know how many claims will eventually be filed.

**(e) The Risk of Nonpayment**

As discussed above, the risk of nonpayment was substantial given Corel's declining revenues and operating losses, as well as the potential for bankruptcy proceedings. In addition, the likelihood that Corel would be acquired by another corporation, resulting in the draining of Corel's remaining cash before plaintiffs obtained judgment, exacerbated this risk.

**(f) The Amount of Time Devoted to the Case by Plaintiffs' Counsel**

Plaintiffs' counsel spent 5,754.15 hours litigating this case. In addition, other at-

**3.** This is the first factor a court should consider. *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 197 (3d Cir.2000) ("The complexity and duration of the litigation is the first factor a district court can and should consider in awarding fees.").

torneys for plaintiffs spent 949.85 hours. The time plaintiffs' counsel devoted to this case represents a substantial commitment to this litigation. Also, as the record of this litigation reflects, the time spent by plaintiffs' counsel was necessary for the successful prosecution of this case considering both the complexity involved and the defense mounted by defendants.

(g) **Awards in Similar Cases**

This District has observed that fee awards frequently range between nineteen and forty-five percent of the common fund. *In re SmithKline Beckman Corp. Secur. Litig.,* 751 F.Supp. 525, 533 (E.D.Pa.1990). Here, the 33⅓% fee request in this complex case is within the reasonable range.

Additionally, the Third Circuit recommends cross-checking percentage awards by the lodestar method. *Gunter,* 223 F.3d at 195 n. 1. The lodestar is determined by multiplying the number of hours counsel reasonably expended by a reasonable billing rate for such services. *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Maldonado v. Houstoun,* 256 F.3d 181, 184 (3d Cir.2001). In this case, plaintiffs' counsel's lodestar is $2,255,813.75. Plaintiffs' counsel's fee request of $2,333,333 represents a multiple of only 1.03 times the lodestar. Since multiples between lodestars and fee requests tend to range between 1 and 4, the multiple in this case is at the lower end, a factor which militates in favor of approval. 4 Herbert B. Newberg and Alba Conte, Newberg on Class Actions, § 14.6, at 578 (4th ed.2002).

2. **The Objections of Aberger, Adelstein, and Abramowitz**

Objectors Aberger, Adelstein, and Abramowitz object to the requested award of attorney's fees as excessive and unreasonable. Although I find that the objections raised by these three objectors do not diminish the overall reasonableness of the fee, I will address each of the objections below.

Objector Abramowitz simultaneously claims that "[t]his matter resolved early into the litigation process *before* any discovery could be conducted by the parties," and "at least half of the plaintiffs' counsel lodestar was spent on needless confirmatory discovery." (Abramowitz Mem. at 3) (emphasis added). Putting aside the obvious inconsistency between these two statements, I find these objections to be without merit. First, contrary to Abramowitz's assertion, this case was resolved at the end of the fact discovery period after I had already made numerous rulings on both substantive and procedural matters. Second, the extensive discovery conducted by plaintiffs' counsel in this case aided their efforts to achieve this settlement and was not merely confirmatory.

Objectors Adelstein and Aberger also object to the requested fee as unreasonable despite acknowledging that "the most critical factors in this analysis [award of attorneys' fees] should be the amount of time devoted to the case by plaintiff's counsel and awards in similar cases." (Adelstein and Aberger Mem. at 7). Although Adelstein and Aberger admit in their memorandum that they do not know how much time plaintiffs' counsel actually expended in this case, plaintiffs' counsel's over three years of litigation in fact amounts to a lodestar of $2,255,813.75. Therefore, plaintiffs' counsel's fee request represents a multiplier of only 1.03.

Contrary to the assertions of the objectors Abramowitz, Adelstein and Aberger, this settlement was only reached after a tremendous, but necessary, amount of work had been expended by plaintiffs' counsel. Since plaintiffs' counsel has in-

vested considerable time and utilized their skill and expertise to effectuate a result beneficial to the class despite complex issues of law and fact, an award of 33⅓ % of the settlement fund is appropriate.

### 3. Costs Requested

 In addition to fees, plaintiffs' counsel also requests reimbursement for litigation expenses in the amount of $161,824.89. "There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of ... reasonable litigation expenses from that fund." *Ikon*, 194 F.R.D. at 192; *see also, In re SmithKline Beckman Corp. Sec. Litig.*, 751 F.Supp. 525, 531 (E.D.Pa.1990). The expenses incurred include the costs associated with retaining various experts and taking depositions of fact witnesses. In addition, the notice informed class members that plaintiffs' counsel would seek reimbursement of expenses in an amount not to exceed $200,000. These expenses are reasonable and necessary to this case and, as such, are approved.

### 4. Reimbursement of Lead Plaintiffs' Expenses

Additionally, plaintiffs' counsel seeks reimbursement of lead plaintiffs' expenses in the amount of $10,325.00. Incentive awards are "not uncommon in class action litigation ... particularly where ... a common fund has been created for the benefit of the entire class." *Cullen*, 197 F.R.D. at 144 (quoting *In re S. Ohio Corr. Facility*, 175 F.R.D. 270, 272 (S.D.Ohio 1997)). In fact, "[c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Id.* Courts in this District have not hesitated to assure that those undertaking class liti-

gation are not penalized for placing a class's interest above their own. *See, e.g., In re SmithKline Beckman Corp. Securities Litigation*, 751 F.Supp. 525 (E.D.Pa. 1990). During the course of this litigation, the lead plaintiffs each responded to the defendant's written discovery requests and were deposed. Therefore, I approve reimbursement to the following lead plaintiffs: Fred Spagnola in the amount of $2800.00, Michael Perron in the amount of $400.00, and David Chavez in the amount of $7125.00.