**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 16-3965, 17-2451
_____

IN RE: NEW JERSEY TAX SALES CERTIFICATES ANTITRUST LITIGATION


ARLENE M. DAVIES,
                                   Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(District Court No. 3-12-cv-01893)
District Judge: The Honorable Michael A. Shipp

_____

No. 16-3965 Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
July 13, 2017
No. 17-2451 Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
Aug. 1, 2018

_____

Before: McKEE, AMBRO, and ROTH, *Circuit Judges*.

(Opinion Filed: September 6, 2018)

_____

OPINION*

_____

_____

    * This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does
not constitute binding precedent.

McKEE, *Circuit Judge.*

In these associated appeals, Objector-Appellant Arlene Davies challenges several decisions of the District Court in relation to settlements in an underlying antitrust class action concerning New Jersey tax sale certificates.[1] Davies challenges the District Court's order granting final approval of those settlements.[2] She also appeals the District Court's order imposing an appeal bond.[3] For the reasons that follow, we will affirm.

## I. Class Settlement

Davies argues that the District Court abused its discretion by approving a $9.59 million cash compensation settlement in a class action lawsuit.[4] She asserts that the settlement amount is not "fair, reasonable, and adequate," as required under Rule 23(e)(2)

---

[1] The underlying class action involves an alleged eleven-year statewide conspiracy to rig tax lien auctions in New Jersey. As part of the State's statutory scheme to regulate the existence and sale of tax liens for unpaid property taxes, N.J.S.A. 54:5-1 to -137, New Jersey tax lien auctions occur when a State resident fails to pay property taxes and the municipality in which the property lies auctions the lien to prospective buyers pursuant to N.J.S.A. 54:5-19. The auction process is designed to be competitive, with bidding opening at an initial interest rate of 18 percent (representing the interest that the defaulted property owner must pay on the tax debt), which decreases with each successive bid. The underlying class action in this matter involved a claim that bidders colluded to keep interest rates higher than they would otherwise have been in competitive auctions.

[2] Davies's appeal of the settlement approval and certification orders is listed as Case No. 16-3965. References to the filings in that case, including the appendix, will use the prefix "Settlement" so as to distinguish from filings in the associated case, Case No. 17-2451.

[3] Davies's appeal of the order imposing an appeal bond is listed as Case No. 17-2451. References to the filings in that case, including the appendix, will use the prefix "Bond" so as to distinguish from filings in the associated case, Case No. 16-3965.

[4] We note that the parties dispute whether Davies has standing to appeal. For purposes of this opinion, we will assume arguendo that Davies has standing. *See Diggs v. Penn. Pub. Util. Comm'n*, 180 F.2d 623, 626 (3d Cir. 1950).

of the Federal Rules of Civil Procedure. She also claims that the structure of the settlement itself is unfair due to its distribution terms, which she says precludes approval. We review each of her arguments in turn.

## A. Fairness of the Settlement

A class action settlement is "left to the sound discretion of the district court," and we accord great deference to the District Court's factual findings.[5] Accordingly, we review class settlements and certifications for an abuse of discretion.[6] An abuse of discretion occurs when a "district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact."[7]

A class action may not be settled under Federal Rule of Civil Procedure 23(e) unless the proposed settlement is "fair, reasonable and adequate."[8] To determine whether a class action settlement meets these standards, courts in this circuit employ the test set forth in *Girsh v. Jepson*,[9] which requires consideration of the following factors: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to

---

[5] *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975).
[6] *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 782-83 (3d Cir. 1995) [hereinafter *In re GMC*].
[7] *Id.* at 783 (quotation marks omitted) (citing *Int'l Union UAW v. Mack Trucks, Inc.*, 820 F.2d 91, 95 (3d Cir. 1987).
[8] Fed. R. Civ. P. 23(e).
[9] 521 F.2d at 157.

withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.[10] A court may approve a settlement even if it does not find that each of these factors weighs in favor of approval.[11]

Where negotiations were conducted "at arms' length by experienced counsel after adequate discovery, . . . there is a presumption that the results of the process adequately vindicate the interests of the absentees."[12] However, in cases such as this, where approval for settlement and class certification are sought simultaneously, "we require district courts to be 'even more scrupulous than usual' when examining the fairness of the proposed settlement."[13] This is intended to "ensure that class counsel has engaged in sustained advocacy throughout the course of the proceedings, particularly in settlement negotiations, and has protected the interests of all members."[14]

Here, the District Court concluded that all but one of the aforementioned *Girsh* factors weighed in favor of approving the settlement.[15] Most relevant to this appeal, the District Court determined that the precise damages achieved by a winning verdict were

---

[10] *Id.*

[11] *See Halley v. Honeywell Int'l, Inc.*, 861 F.3d 481, 489-90, 491 (3d Cir. 2017) (affirming settlement approval where some factors did not weigh in favor of settlement).

[12] *In re GMC*, 55 F.3d at 796.

[13] *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004) (quoting *In re GMC*, 55 F.3d at 805).

[14] *Id.*

[15] The District Court determined that only the eighth *Girsh* factor, the ability of the defendants to withstand a greater judgment, weighed against settlement approval.

4

"not possible to predict," but that the "significant risks of establishing liability, damages, and maintaining a class action" nevertheless placed the proposed $9.59 million settlement "within the range of reasonableness."[16]

Davies disagrees. She claims that, in approving the settlement, the District Court incorrectly assessed both the "relative strength of the case" and the eighth *Girsh* factor, the range of reasonableness of the settlement in light of the best possible recovery.[17]

### 1. Relative strength of the case

The fourth and fifth *Girsh* factors "survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement."[18]

Davies claims that the District Court underestimated the relative strength of the case by affording too little weight to the direct evidence. She specifically cites the guilty pleas of several defendants and representatives of the defendant companies in connection to the alleged bid-rigging conspiracy and complains that these guilty pleas contradict the District Court's assessment of the strength of the case. She contends that the court's findings are also undermined by the allegations in Plaintiffs' First Amended Complaint and the court's own observation at the motion-to-dismiss stage that those allegations

---

[16] Settlement App. 45-46. In addition to the *Girsh* analysis, the District Court found that other considerations weighed in favor of approving the proposed settlements, including the ability of class members to opt out and the fact that experienced counsel engaged in arm's-length negotiations.

[17] Davies's Settlement Br. 21.

[18] *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 319 (3d Cir. 1998); *see Girsh*, 521 F.2d at 157.

"provide the necessary facts and circumstantial evidence needed to establish" a broader statewide conspiracy.[19]  Finally, she disagrees with the District Court's "undue emphasis" on the generic litigation risks inherent in any class action and with the court's supposition that antitrust class actions are difficult to prove.[20]

There is no error.  Although they are somewhat helpful to Plaintiffs' claims of liability as to specific defendants, the guilty pleas do not define the scope of any bid-rigging.  They do not identify specific auctions that the defendants rigged or the degree to which the rigging affected the eventual interest rate on any given lien.[21]  Moreover, only fifteen of the fifty defendants entered guilty pleas, and several defendants were acquitted of criminal charges pertaining to the alleged scheme.  Without more detailed evidence as to the specific auctions that were affected by these defendants' criminal activity, or the extent of the impact, we cannot say that the District Court abused its discretion in acknowledging the limited value of these criminal pleas in the overall context of this complex antitrust class action.

Davies's reliance upon the allegations in the First Amended Complaint is also misplaced.  Allegations are not evidence.  Nor are they transformed into evidence by a

---

[19] Davies's Settlement Br. 30 (alteration omitted) (quoting Settlement App. 1218 (Oct. 31, 2014 Mem. Op. on Defendants' Motion to Dismiss the First Amended Complaint)).

[20] *Id.* at 31.

[21] Indeed, only three of the guilty pleas even refer to illegal bid-rigging activity in the first two years of the class period, which began in 1998. *See* Settlement App. 1615 (describing information in guilty plea of Robert W. Stein); Settlement App. 1620 (describing information in guilty plea of Crusader Servicing Corp.); Settlement App. 1624 (describing information in guilty plea of Robert U. Del Vecchio, Sr.).

court's conclusion that they are sufficient to survive a challenge under Federal Rule of Civil Procedure 12(b)(6). Rule 12(b)(6) "does not impose a probability requirement" for inferring, as in this case, the existence of an illegal agreement between the defendants.[22] It "simply calls for enough facts to raise a reasonable *expectation* that discovery will reveal evidence" of Plaintiffs' claim, not a conclusion that such evidence has already been revealed.[23] Accordingly, Davies cannot support her high estimation of the strength of Plaintiffs' case by pointing to the District Court's appraisal of their allegations at the motion-to-dismiss stage.

Finally, we find no abuse of discretion in the District Court's discussion of the litigation risks. Though Davies argues that the court emphasized the risks inherent in any general class action or in an antitrust class action, she supplies no authority for her position. Davies's Settlement Br. 31. The District Court, in contrast, supported its conclusion that antitrust actions such as this are "complex . . . to prosecute."[24] Its observation was reasonable in light of the elements Plaintiffs must demonstrate to establish their claim under § 1 of the Sherman Act, e.g., that the defendants engaged (1) in a concerted action that (2) produced anticompetitive effects within the relevant product and geographic markets, (3) was illegal, and (4) injured the class as a proximate result.[25,]

---

[22] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).
[23] *Id* (emphasis added).
[24] Settlement App. 40 (citing *In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 102 (D.N.J. 2012)).
[25] *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 267 (3d Cir. 2009).

7

[26] The court had already observed that not all of the auctions were rigged. Moreover, for those auctions that were rigged, the resulting interest rates on Plaintiffs' liens may not have been different absent the conspiracy.[27] Davies supplies no authority for the proposition it would be easy to establish Plaintiffs' likely interest rate absent the conspiracy[28] or for the proposition that the duty to undertake such an inquiry should be lightly weighed. We find the District Court's reliance upon such factors to have been

---

[26] Davies asserts that Plaintiffs would not be required to conduct an auction-by-auction analysis and that they would only need to show that Defendants agreed to rig auctions. While that may be true for purposes of demonstrating that Defendants engaged in concerted action, *see W. Penn. Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010) ("A plaintiff may plead an agreement [in violation of § 1 of the Sherman Act] by alleging . . . circumstantial evidence . . . ."), Plaintiffs are still required to show that Defendants' antitrust scheme was the proximate cause of Plaintiffs' injury. *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 267. That requires an analysis of each auction.

[27] Davies criticizes this determination as lacking any evidentiary basis and as amounting to nothing more than blind acceptance of Class Counsel's "[c]onclusory [a]llegations" regarding the scope of the conspiracy. Davies's Settlement Br. 24. She also argues that this determination cannot be reconciled with the court's findings upon certifying the class, because the class definition was fashioned from the First Amended Complaint's allegations of a widespread conspiracy.

Davies once more relies incorrectly on the evidentiary value of the allegations in the First Amended Complaint. These allegations may reflect a good-faith appraisal of Plaintiffs' best case regarding the scope of the conspiracy, but they do not establish that the conspiracy existed at such breadth or that the theory would not shift as more evidence was obtained. Furthermore, Davies's argument improperly assumes that because the District Court accepted the likely "statewide" character of the conspiracy for purposes of defining the class, the court cannot find that any auctions were free from rigging. Davies's Settlement Br. 29. She provides no support for this supposition.

[28] During the final settlement approval hearing held on April 25, 2016, the District Court learned that ascertaining the extent of the injury would require Plaintiffs to (1) create a database of all tax liens sold during class period, showing how many bids were made for each; (2) siphon out liens purchased by non-defendants; and (3) obtain lien data from the start of the class period to establish how a market free of collusion would look. Class Counsel claimed that such efforts would easily amount to millions of dollars in expert fees and data costs.

8

reasonable.[29]

## 2. Range of reasonableness of the settlement

The eighth and ninth *Girsh* factors focus on the range of reasonableness of a settlement in light of both the best possible recovery and the risk the parties would face if the case went to trial.[30]  "In order to assess the reasonableness of a proposed settlement seeking monetary relief, 'the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement.'"[31]

Davies asserts, as a preliminary matter, that Class Counsel presented "no evidence" of the class's damages or the factors bearing thereupon that permit rational evaluation of the settlement amount.[32]  She claims that the District Court therefore abused its discretion by accepting the conclusory allegations of counsel regarding the scope of the conspiracy.

Davies misapprehends the evidentiary requirements for the evaluation of proposed class settlements.  Though the court "cannot substitute the parties' assurances or conclusory statements for its independent analysis of the settlement terms" in approving a settlement,[33] admissible evidence is not required.[34]  Rather, the settlement evaluation

---

[29] *Cf. In re Prudential*, 148 F.3d 283, 318 (3d Cir. 1998).
[30] *Id.* at 322; *Girsh*, 521 F.2d at 157.
[31] *In re Prudential*, 148 F.3d at 322 (quoting *In re GMC*, 55 F.3d at 806).
[32] Davies's Settlement Br. 24-25.
[33] *In re Pet Food Prod. Liab. Litig.*, 629 F.3d 333, 350-51 (3d Cir. 2010).
[34] *See In re Prudential*, 148 F.3d at 319 ("The parties must have an 'adequate appreciation of the merits of the case before negotiating.'" (quoting *In re GMC*, 55 F.3d

9

involves only "two types of evidence: a substantive inquiry into the terms of the settlement relative to the likely rewards of litigation[] and a procedural inquiry into the negotiation process."[35] The former requires a judge to "apprise[] himself [or herself] of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated."[36] However, "all" does not mean "all" in this context; in evaluating a settlement reached in hopes of avoiding trial, a judge is not required to conduct a mini-trial.[37]

Here, the court pointed to a substantial amount of both direct and circumstantial evidence Class Counsel identified in support of the finding that only some auctions were rigged. Specifically, the court emphasized the "bid books" Class Counsel obtained from various defendants outlining details about the bid-rigging conspiracy. The court learned that, after comparing these books with information provided by early-settling defendants, Class Counsel was able to identify only fifty auctions that were allegedly rigged. The

---

at 813)); 2 McLaughlin on Class Actions § 6:8 (14th ed.) (settling parties are required to provide the court with: (i) sufficient factual background to the matter to provide comfort that the court is making an informed decision, including any analyses of that information they deem appropriate; (ii) a procedural history of each case; (iii) the arguments of the settling parties regarding the underlying legal claims, and a frank evaluation of the strengths and weaknesses of the respective positions; (iv) any Memoranda of Understanding; (v) the settlement agreement and a description of its key terms, including the scope of the class releases and all benefits to class members; and (vi) an affidavit from class counsel affirming why they support the settlement and believe it to be in the best interest of class members).

[35] *In re GMC*, 55 F.3d at 796 (citations omitted).

[36] *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424 (1968) (dealing with the compromise of claims in bankruptcy).

[37] *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982).

court also learned that Plaintiffs had received additional financial information from the settling defendants that set out their financial condition. Much of this information indicated the amount of liens their conduct likely affected and corroborated the figures contained in filings in the criminal proceedings against some defendants. And as noted above, several defendants had been acquitted of criminal charges relating to the alleged conspiracy, and most had not been criminally charged at all. The court had also been informed that Plaintiffs had amassed nearly 30,000 pages of documents from Defendants; that Class Counsel had expended more than 7,000 hours on achieving the settlement; and that proving each defendant's liability and the specific effect on individual auctions would be a "very, very complicated" task.[38]

The court clearly possessed sufficient information to evaluate the reasonableness of the settlement and to "detail the exceptional weakness of [P]laintiffs' case."[39] Indeed, the court emphasized the class members' difficult burden of showing that a particular tax lien was the subject of a conspiracy and the price at which the lien would have sold absent the conspiracy. The court also highlighted both Defendants' intent to oppose class certification and move for summary judgment, and the complexities inherent in prosecuting a case that sounds in antitrust and that involves a settlement class of thousands. Accordingly, the court's conclusion that the settlement was reasonable in light of the attendant risks of litigation is amply supported by this record.

---

[38] Settlement App. 2612.
[39] Davies's Settlement Reply Br. 4.

11

Davies nevertheless claims that the strength of the case did not justify the settlement because it constituted a mere 2.5 percent of the best possible recovery, which she posited to be $400 million,[40] a figure the court "accept[ed]" in its approval order.[41] However, Davies's calculation is based upon a mischaracterization of the scope of the alleged bid-rigging conspiracy. Namely, it is founded not upon the value of Plaintiffs' overall tax liens, but upon Plaintiffs' statement in the First Amended Complaint that New Jersey's 566 municipalities auction up to $200 million in delinquent tax obligations *in total* every year.[42] The calculation also presumes that the full $200 million in tax sale certificates would, in the case of a best possible recovery, have been bought at an 18 percent interest rate (the initial interest rate set for a given tax sale bid), such that there would have been only a single bid per lien. Davies's calculation of the best possible recovery is necessarily overbroad, as it pertains to the specifics of the alleged bid-rigging scheme in this case, and it is more than unrealistic, as it concerns the structure of New

---

[40] Davies arrived at this calculation by determining that one year's interest at 18% (the initial interest rate set for a given tax sale bid) on $200 million in tax sale certificates amounts to $36 million, which nears $400 million when extrapolated over the class period of 1998–2009. This figure does not include treble damages or pre-judgment interest, which a district court is not required to consider in assessing the fairness of a proposed settlement. *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 325 (3d Cir. 2011) (en banc).

[41] Settlement App. 46 ("[A]ccepting Ms. Davies's calculations[,] the Court evaluates the reasonableness of the settlement fund in light of a best possible recovery of $400 million.").

[42] The $200 million figure is the high end of Plaintiffs' $100-200 million estimation of the *total* tax sale certificate revenue earned by *all* New Jersey municipalities from *all* auctions and *all* bidders, regardless of whether they include the defendants in this case or the liens of the proposed class members.

Jersey's tax sale certificate auctions.

More critically, Davies provides no authority for her claim that a settlement cannot be reasonable if it constitutes a certain percentage of the best possible recovery. In fact, we have said that an "evaluating court must . . . guard against demanding too large a settlement" since, "after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution."[43] In recognition that "the outcome of litigation is always uncertain and inevitably time-consuming and expensive, courts have long held that a cash settlement providing only a fraction of the potential recovery does not render a settlement inadequate or unfair."[44] Given our conclusion that the District Court did not err in evaluating the complexity of this action, the risks of trying to maintain class certification and of establishing damages and liability, the court did not abuse its discretion in approving the settlement as within the range of reasonableness.[45]

### 3. Other Girsh factors

Under the third *Girsh* factor, courts inquire into the type and amount of discovery the parties have undertaken.[46] Davies emphasizes that settlement was reached in this case prior to formal discovery and claims that the court abused its discretion in accepting Class Counsel's undetailed account of its informal discovery.

---

[43] *In re GMC*, 55 F.3d at 806.

[44] 2 McLaughlin on Class Actions § 6:16.

[45] Settlement App. 41 (noting that, out of thousands of class members, only three opted out of the settlement and two objected to it, thus satisfying the second *Girsh* factor of the class's reaction); *see In re Pet Food*, 629 F.3d at 351 (holding that an overwhelmingly positive response from the class satisfies the second *Girsh* factor).

[46] *In re Prudential*, 148 F.3d at 319; *Girsh*, 521 F.2d at 157.

13

As noted above, Class Counsel provided the District Court with copious information regarding the amount of informal discovery obtained. Furthermore, Plaintiffs began obtaining discovery from some defendants as early as 2012, and continued requesting and receiving discovery until at least the middle of 2014.[47] We thus find no error in the court's conclusion that this factor weighed in favor of settlement.[48]

### B. Potential Unequal Treatment of Class Members

Next, Davies argues that even if the cash portion of the settlement is fair, reasonable and adequate, the structure of the settlement is not. She specifically points to the fact that plaintiffs with outstanding tax liens will receive a redemption discount in addition to the cash settlement. Davies argues that this amounts to disparate treatment of class members, thus precluding approval of the settlement. However, we have held that allocation settlements may indeed differ among class members based on the extent of

---

[47] *See McAlarnen v. Swift Transp. Co., Inc.*, No. 09-1737, 2010 WL 365823, *7 (E.D. Pa. Jan. 29, 2010) (finding that third *Girsh* factor weighed in favor of settlement where "[s]ubstantial briefing and research on the issues ha[d] taken place").

[48] We also reject Davies's argument that the District Court abused its discretion in assessing the second and seventh *Girsh* factors, which respectively inquire into the class's reaction to the settlement and the ability of the defendants to withstand a greater judgment. *Girsh*, 521 F.2d at 157. Davies generally asserts that the court "should [have] accorded little weight" to the second factor, but the court properly observed that, of an estimated class of thousands of members, only two individuals objected to the settlement, including Davies. Similarly, though the court found the seventh factor to weigh against settlement, Davies passingly complains that it should have afforded this factor more weight "[i]n light of its other errors." Settlement App. 33. That is not the standard for an abuse of discretion, and Davies supplies no support for her supposition that error in evaluating one *Girsh* factor should automatically endanger a finding under the other *Girsh* factors. In any event, as we have already explained, we disagree that there was any error in the *Girsh* analyses that the court performed and that Davies now challenges.

14

their damage.[49]  And here we find it reasonable that the negotiated settlement treats class members who still maintain outstanding tax liens differently than those without tax liens of relief.[50]  While this may mean that certain persons may receive greater settlement benefits than others, such allocation is reasonable, and the District Court's approval was not an abuse of discretion.

## II. Rule 7 Appeal Bond

Under Federal Rule of Appellate Procedure 7, a "district court may require an appellant to file a bond or provide other security in any form and amount necessary to ensure payments of costs on appeal."  We review an order to impose an appeal bond under Rule 7 for an abuse of discretion.[51]  However, we apply a de novo standard in determining costs allowable for an appeal bond, which is a legal question.[52]

Davies argues that imposition of an appeal bond constituted error.  She claims that the court improperly included administrative expenses within its calculation of "costs on

---

[49] *Sullivan v. DB Inv., Inc.*, 667 F.3d at 328 ("Courts generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable, and we are mindful that district courts have broad supervisory powers over the administration of class action settlements to allocate the proceeds among the claiming class members equitably." (internal quotation marks and citations omitted) (citing *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 469 (D.N.J. 2008); *In re Corel Corp., Inc. Sec. Litig.*, 293 F. Supp. 2d 484 493 (E.D. Pa. 2003)).

[50] This argument is bolstered by the fact that the redemption discounts are independent from the settlement funds available to all class members and were not shown to have affected those funds, regardless of whether a person had an outstanding tax lien.

[51] *See* Fed. R. App. P. 7, 1979 advisory committee's note ("The amended rule would leave the question of the need for a bond for costs and its amount in the discretion of the court."); *Adsani v. Miller*, 139 F.3d 67, 71, 79 (2d Cir. 1998).

[52] *In re Target Corp. Customer Data Sec. Breach Litig.*, 847 F.3d 608, 614 (8th Cir. 2017); *Adsani*, 139 F.3d at 71.

appeal" under Rule 7.[53]  She further contends that even if an appeal bond was authorized,

the amount was unreasonable because the only costs for which she should be liable are

taxable against her under Rule 39.  She additionally states that such a large amount,

particularly when inclusive of administrative costs, is only appropriate when serial

objectors pursue meritless appeals.

Davis provides no binding authority for her claims.[54]  Moreover, although we have

not yet formally held that administrative expenses may be included in Rule 7 appeal

bonds, we have previously permitted their inclusion.[55]  Thus, we find no abuse of

discretion in the court's inclusion of administrative expenses in Davies's appeal bond.

We also note that though Plaintiffs requested an appeal bond of at least $61,845,

the District Court found their request excessive and only ordered a $10,000 bond.  The

District Court reasoned, and we agree, that the amount of the bond did not foreclose

---

[53] Davies's Bond Br. 17-18.

[54] Davies incorrectly states that there is unanimity from our sister circuit courts of appeals in determining that Rule 7 bonds cannot include administrative expenses, and cites to both non-precedential, out-of-circuit opinions as well as out-of-circuit opinions that address separate issues such as attorney's fees. *See* Davies's Bond Br. at 17–18 (quoting *In re Target Corp. Customer Data Sec. Breach Litig.*, 847 F.3d 608 (8th Cir. 2017); *Allen v. J.P. Morgan Chase Bank, NA*, No. 15-3425, 2015 WL 12714382 (7th Cir. Dec. 4, 2015); *Tennille v. W. Union Co.*, 774 F.3d 1249 (10th Cir. 2014); *Int'l Floor Crafts, Inc. v. Dziemit*, 420 Fed. App'x 6 (1st Cir. 2011); *Adsani*, 139 F.3d at 67; *Azizian v. Federated Dep't Stores, Inc.*, 499 F.3d 950 (9th Cir. 2007); *Vaughn v. Am. Honda Motor Co.*, 507 F.3d 295 (5th Cir. 2007); *In re Cardizem CD Antitrust Litig.*, 391 F.3d 812 (6th Cir. 2004); *Pedraza v. United Guar. Corp.*, 313 F.3d 1323 (11th Cir. 2002); *In re Am. President Lines, Inc.*, 779 F.2d 714 (D.C. Cir. 1985)).  While several of our sister circuits have stated that Rule 7 cannot include administrative bonds, it is incorrect to state that there is unanimity.  *See In re Nutella*, 589 F. App'x 53, 61 (3d Cir. 2014) (affirming imposition of appeal bond including administrative costs).

[55]*See In re Nutella*, 589 F. App'x at 61.

16

Davies's ability to appeal the class settlement decision while still providing some security to the Plaintiffs of the original class action. Given the District Court's vast reduction of the bond request and its analysis of both the costs incurred by Plaintiffs as well as Davies's ability to pay, we discern no abuse of discretion in its determination to order a $10,000 appeal bond under Rule 7.

III.

For the reasons set forth above, we affirm the judgment of the District Court.